IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CITY OF ST. CHARLES, MISSOURI, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:23-cv-1190-JAR |
| UNION ELECTRIC COMPANY d/b/a AMEREN MISSOURI, | ) |
| Defendant. | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND DISSOLVE PLAINTIFF'S TEMPORARY RESTRAINING ORDER**

Defendant Union Electric Co. d/b/a Ameren Missouri ("Ameren") respectfully requests that the Court: (1) dismiss Plaintiff City of St. Charles, Missouri's (the "City") Verified Petition for Temporary Restraining Order and Preliminary and Permanent Injunction ("Verified Petition") pursuant to Fed. R. Civ. P. 12(b)(6); and (2) dissolve the state court's Temporary Restraining Order ("TRO") pursuant to Fed. R. Civ. P. Rule 65(b)(4).

**INTRODUCTION**

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") preempts the City's claim that Ameren must obtain the City's approval to carry out remedial work at a Superfund site. Under CERCLA, the *Environmental Protection Agency* ("EPA") has exclusive authority to "approve" Ameren's remedial work, not the City. Therefore, to protect the congressional objective behind the Superfund statute and afford deference to the expertise of the EPA, CERCLA prohibits state and local governments from enforcing their own zoning and permitting requirements when they interfere with the EPA's authority.

For more than a decade, Ameren has conducted investigation and remedial work at a substation on Huster Road in St. Charles, Missouri (the "Substation") and the surrounding area. Ameren has conducted that work at the direction of the EPA under, and in compliance with, two Administrative Settlement Agreement and Orders on Consent ("ASAOCs"). Until a few days ago, the City never purported to suggest that the City possessed veto rights over Ameren's EPA-approved work. Nevertheless, on September 14, 2023, the City sought and received an *ex parte* TRO in state court that orders Ameren "to submit plans and specifications for its proposed work to the City of St. Charles for approval before commencing work," regardless of when and whether Ameren receives EPA approval. *See* Exhibit 1, *City of St. Charles, Mo. v. Union Elec. Co.*, No. 2311-CC00954 (the "State Court Action"), TRO.

Contrary to the *ex parte* TRO, CERCLA preemption ensures that Ameren is not required to apply for, or receive, selective City "approval" to carry out EPA-approved work. Furthermore, even if the City's claims were not preempted, the local ordinance upon which the City purports to rely is inapplicable to the facts of this case. As a result, the City's Verified Petition fails as a matter of law, and it must be dismissed.

Because the City's Verified Petition is both preempted and meritless, the TRO must also be dissolved. The factual underpinnings of the TRO were meritless from inception. Approaching the state court *ex parte*, the City suggested to the Court that Ameren started construction of the well when no drilling or construction had commenced. On the contrary, Ameren was, and is, committed to waiting for EPA approval before commencing any such work. Indeed, Ameren conveyed that commitment to the City on multiple occasions, including the day of the TRO, as well as to the EPA and the United States Department of Justice ("DOJ"). The balance of harm and public interest both weigh in favor of dissolving the TRO. No irreparable harm has or will occur,

and there is no actual activity to be enjoined.  Accordingly, the TRO must be dissolved.

I.     **BACKGROUND**

   A.   **The City Attempts to Exercise Control Over Ameren's Work at a Superfund Site.**

In 2012, Ameren entered into its first settlement agreement with the EPA and Missouri Department of Natural Resources ("MDNR") regarding remedial and investigative work at the Substation.[1]  *2012 Settlement Agreement and Administrative Order on Consent for Groundwater Containment System and Integrated Site Evaluation*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, attached as Exhibit 3.  On January 2, 2018, Ameren, EPA, and MDNR entered into a second publicly available Administrative Settlement Agreement and Order on Consent ("2018 Settlement Agreement").  *2018 Administrative Settlement Agreement and Administrative Order on Consent for Groundwater Containment System and Integrated Site Evaluation*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, attached as Exhibit 4.

Recently, on February 16, 2023, the EPA "determined there [wa]s a need for additional work to be completed" and "direct[ed] Ameren to implement" multiple actions "[p]ursuant to the terms of the [2018 Settlement Agreement]."  Exhibit 5, EPA's Feb. 16, 2023 Letter to Ameren.  Those actions, undertaken by Ameren, led to the current response from the City.

According to the City, City Well No. 4 ("CW-4") has been inactive for 18 years—since 2005.  *See* Exhibit 6, CITY OF ST. CHARLES, WELLFIELD INFORMATION, https://www.stcharlescitymo.gov/1107/Wellfield-Information (last visited Sept. 22, 2023).  On August 7, however, the City turned on CW-4, and began pumping the well at rates that exceed historical usage.  *See* Exhibit 7, EPA's Sept. 18, 2023 Letter to Ameren.  According to the City's

---

[1]   A declaration from Joseph F. Madonia regarding the accuracy of the exhibits attached to this Memorandum is attached as Exhibit 2.

correspondence with the EPA, the sole purpose of pumping CW-4 was to determine whether there would be a risk of transmitting contamination to the water treatment plant if the City put the well into production.  *See id.*  As noted below, this information has been contradicted by other statements from City officials.

The City initially planned to pump CW-4 for 30 days.  *See id.*  But the City later notified the EPA that the City planned to continue pumping beyond the initial 30-day period to test the efficacy of Ameren's remedial measures and to calculate the projected load on the City's granular activated carbon system it planned to install.  *See id.*  In the last 30 days, it is estimated that the City has pumped more than 48 million gallons—equivalent to a 10-acre, 14-foot-deep lake—of clean groundwater from CW-4 directly into the sewer system.

The City's pumping impaired Ameren's ongoing, EPA-approved remedial efforts at the Substation.  *See* Exhibit 8, Ameren's Sept. 14, 2023 Letter to the City.  In response to the City's actions, Ameren sought the EPA's approval to install an additional extraction well on the Substation property to counteract the negative effects of the City's pumping—including, but not limited to, the expansion of the contaminant plume.  Exhibit 9, *Supplement to the Monitoring Well Installation Work Plan for Huster Rd. Substation (OU4)* (the "Workplan").

On August 29, 2023, pursuant to the 2018 Settlement Agreement, Ameren submitted its Workplan to the EPA, outlining Ameren's rationale for installing the additional extraction well to offset the City's harmful and unprecedented pumping at CW-4.  *Id.*  The extraction well will route groundwater away from CW-4 and into a groundwater extraction and treatment system in operation since 2014, all subject to EPA and MDNR oversight.  *Id.*  EPA provided comments on Ameren's Workplan on September 6.  *See* Exhibit 10, EPA's Sept. 6, 2023 Letter to Ameren.

On September 7, 2023, the EPA requested the City halt pumping at CW-4 for several weeks

4

to avoid further negative impacts on Ameren's remediation efforts and allow for additional testing related to a recent drop in ammonia levels. *See* Exhibit 11, EPA's Sept. 7, 2023 Letter to the City. On September 14, Ameren submitted a revised Supplement to Monitoring Well Installation Work Plan ("Supplement to Workplan"), addressing the EPA's comments and again urging the EPA to approve installation of the additional extraction well on its property to counteract the potentially negative impacts on the EPA-approved remedy caused by the City's pumping of CW-4. *See* Exhibit 12, Supplement to Ameren's Workplan.

On September 13, in preparation for EPA approval of the extraction well, Ameren began staging equipment at the Substation. Although Ameren did not commence work and was "awaiting final approval from EPA" before drilling the single, additional extraction well, *see* Exhibit. 8, Ameren's Sept. 14, 2023 Letter to the City, the City sent multiple correspondences asking Ameren cease and desist from drilling the well without a City-issued permit, *see* Exhibit 13, City's Sept. 13, 2023 Letter to Ameren; *see also* Exhibit 14, City's Sept. 14, 2023 Stop Work Order Letter to Ameren.

On September 14, the City posted "STOP WORK" notices outside the Substation and dispatched City personnel and police outside the Substation to further emphasize its effort to exercise jurisdiction over the installation of Ameren's additional extraction well. *See* Exhibit 14, City's Sept. 14, 2023 Stop Work Order Letter to Ameren.

      **B.**      **The City Obtains an *Ex Parte* TRO in State Court.**

Ameren's and the City's counsel were in communication throughout this process. On the morning of September 14, the City's counsel sent correspondence to Ameren's undersigned counsel about these issues. *See id.* Yet, later that day, without providing prior notice to Ameren or its undersigned counsel or inquiring about their availability, the City sought and obtained an *ex*

*parte* TRO in the Circuit Court of St. Charles County, Missouri. *See* Exhibit 1, State Court Action, TRO; *see also* Mo. R. Civ. P. 92(b)(1) ("The court shall not grant a temporary restraining order without prior notice to the party against whom relief is sought unless the party seeking relief establishes that notice cannot be given or notice would defeat the purpose of the order.").

In the morning correspondence, opposing counsel had failed to mention the fact that the City would be filing the Verified Petition or seeking an *ex parte* TRO within a matter of hours. In fact, Ameren first learned of the TRO on the evening of September 14, 2023, following the City's issuance of a press release and a *St. Louis Post-Dispatch* article. *See* Exhibit 15, Mark Schlinkmann, *St. Charles goes to court to bar Ameren from drilling new well near substation*, ST. LOUIS POST-DISPATCH, Sept. 15, 2023, https://www.stltoday.com/news/local/stcharles/st-charles-goes-to-court-to-bar-ameren-from-drilling-new-well-near-substation/article_293e4d4e-5350-11ee-84d3-6707bffdae69.html (last visited Sept. 22, 2023); Exhibit 16, *Press Release*, CITY OF ST. CHARLES, September 14, 2023. Opposing counsel did not provide a copy of the TRO until the following day, confirming the lack of urgency.

In the City's one-count Verified Petition, the City sought to enjoin Ameren "from drilling, constructing or otherwise installing an extraction well on the Substation property." Verified Petition at 6. The City's Verified Petition notes that Ameren had not yet received EPA approval, *id.* ¶¶ 14-15, but never alleges that Ameren had begun, or intended to begin, any drilling, construction, or installation activity without EPA approval. The City acknowledged under oath that Ameren's "clean up efforts have been directed by USEPA," but contended that installation of the well would violate local ordinance §§ 400.320, 510.060-.220, and 410.090. *Id.* ¶¶ 13, 19-24. As a result, the City sought permanent injunctive relief that ordered Ameren "to submit plans and specifications for its proposed work to the City of St. Charles for approval before commencing

6

any work on the extraction well." *Id.*

The City obtained its *ex parte* TRO from the state court. Curiously, the TRO states: "Based upon the conduct set forth in [the] Petition, including but not limited to the fact that Defendant has moved construction and drilling equipment onto its property despite the posted stop-work order issued by the City, there is reason to believe that if notice is given Defendant will attempt to install the extraction well immediately." Exhibit 1, State Court Action, TRO at 2. There is no such allegation in the Verified Petition. In fact, the Verified Petition never mentions Ameren's moving equipment onto the property or the stop work order. Moreover, Ameren mobilized various equipment onto the property on September 13, *before* the stop work order and, on September 14, also provided written notice to the City that it would not commence drilling until it received EPA approval. *See* Exhibit 8, Ameren's Sept. 14, 2023 Letter to the City. Despite Ameren's statement on September 14 that no work was imminent, the City proceeded with seeking the *ex parte* TRO anyway, and Ameren was unable to correct the record before the Court signed the order. Had Ameren been advised that the City intended to seek a TRO as required by the Missouri Rules of Civil Procedure, it would have highlighted to the State Court and the City that it had agreed to wait for EPA's final approval of the work plan before installing the extraction well on its property.

      C.      **EPA Responds to the City's Actions.**

On September 18, 2023, in response to the TRO and correspondence between the City and Ameren, the EPA sent a letter that told the City to turn off CW-4 "as soon as possible" and "refrain from interfering with the response action so as to allow work to proceed with EPA approval." Exhibit 7, EPA's Sept. 18, 2023 Letter to Ameren. The EPA further informed the City that EPA "*objects to potential interference by the city in a CERCLA response action*." *Id*. (emphasis added). EPA stated: "Once the EPA approves the work plan, Ameren must proceed with the EPA-

7

approved CERCLA response action without interference." *Id.* EPA directed the City to "*[t]ake whatever action necessary to allow work to proceed with EPA approval, so as not to interfere in the response action.*" *Id.* (emphasis added). EPA warned that "*[t]he continued pumping of CW-4 deters from*" established objectives under CERCLA "*and may exacerbate contamination at the site, exposing the city to liability.*" *Id.* (emphasis added).

The City has now acknowledged that Ameren had told the City on September 14 that Ameren was not going to install the extraction well without EPA approval. *See* Exhibit 17, City's Sept. 18, 2023 Letter to Ameren. More importantly, the City admitted that "[w]e do not dispute the potential applicability of CERCLA 121(e)(1) to EPA approved remedial work." *Id.* (emphasis removed). The City further concedes that, upon EPA approval, the City's local permit ordinance would be preempted by CERCLA. *Id.* Despite these concessions, the City has not sought to correct the *ex parte* TRO to reflect that EPA's forthcoming approval will supersede the TRO.

Despite the City's concessions on preemption, the City still refuses to dismiss the case or dissolve the TRO. In response to a letter sent by Ameren on September 19 that echoed the EPA's concerns regarding CW-4 and the TRO, *see* Exhibit 18, Ameren's Sept. 19, 2023 Letter to the City, the City responded by suggesting the parties agree to a permanent injunction, which is untenable, *see* Exhibit 19, City's Sept. 21, 2023 Letter to Ameren. In addition, aside from approval of the work plan by the EPA, the City has equivocated on whether it believes its municipal ordinance as it applies to the Substation remediation activities is preempted.

Ameren has now removed the case to federal court and seeks dismissal of the Verified Petition and dissolution of the TRO.

## II.    LEGAL STANDARDS

### A.    Standard for Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), the Verified Petition must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019). The Court need not accept as true the City's conclusory allegations or legal conclusions drawn from the facts. *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999). Furthermore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court properly looks beyond the City's allegations by relying on public records to determine whether Plaintiffs' claims are time-barred. *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

### B.    Standard for Dissolution of TRO

The district court has the authority to dissolve injunctions issued prior to removal. *See Rivera v. Bank of Am., N.A.*, 2019 WL 356612 at *1 (E.D. M. Jan. 29, 2019) (citing 28 U.S.C. § 1450). "The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order, or a preliminary injunction is very high, and by now very well established." *Aerotek, Inc. v. Murphy*, 2017 WL 4617109 at *6 (E.D. Mo. Oct. 16, 2017) (internal citations and quotations omitted); *Blankenship v. Chamberlain*, 2008 WL 4862717 at *2 (E.D. Mo. Nov. 7, 2008) ("[A plaintiff] must demonstrate not only that the four requirements for a preliminary injunction are met but also that they weigh heavily and compellingly in [his or her] favor." (internal citations and quotations omitted)). "The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney *only if . . . specific facts in an affidavit or a verified complaint* clearly show that immediate and irreparable injury, loss, or

9

damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1) (emphasis added); *see Gardner-Alfred v. Fed. Rsrv. Bank of N.Y.*, 2022 WL 748249 at *1 (S.D.N.Y. Mar. 11, 2022).

The Court may dissolve the TRO if the circumstances have changed such that a temporary restraining order is no longer necessary or that the restrained party would be severely injured by continued injunctive relief. *See EPRO Servs., Inc. v. Regenesis Bioremediation Prods.*, 2019 WL 4054030 at *2 (D. Kan. Aug. 28, 2019) ("The motion to dissolve may be granted where the temporary restraining order was improperly issued."). Moreover, a motion to dissolve should be granted where a temporary restraining order was improperly issued. *See Myers v. Frontier PMS*, 2021 WL 2906065 at *6 (E.D. Tex. June 15, 2021), *report and recommendation adopted*, 2021 WL 2894096 (E.D. Tex. July 9, 2021). Therefore when considering whether to dissolve a temporary restraining order, the Court should consider the same four factors used when deciding whether to issue a temporary restraining order: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109,113 (8th Cir. 1981); *see also S. Ohio Sand, LLC v. Preferred Proppants, LLC, 2016* WL 1457773 at *4 (N.D. Ohio Apr. 14, 2016).

### III.   ARGUMENT

The City fails to state a claim for which relief can be granted because CERCLA preempts the City's Verified Petition. The City cannot condition Ameren's ability to carry out its work at the direction of the EPA on the City's own "approval" process. Therefore, the Verified Petition should be dismissed with prejudice.

The Court should likewise dissolve the state court's TRO because the City cannot succeed on the merits of its claim; there is no threat of irreparable harm; the balance of harms weighs against the existence of the TRO; and the public interest favors dissolution.

### A. CERCLA Preempts the City's Verified Petition.

CERCLA preempts the City's state law claim, which relies on local ordinances and permit requirements. *See* 42 U.S.C. § 9621(e)(1); *United States v. City & Cnty. of Denver*, 100 F.3d 1509, 1512 (10th Cir. 1996). Conflict preemption occurs when compliance with both federal and state laws is impossible, and when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Keller v. City of Fremont*, 719 F.3d 931, 940 (8th Cir. 2013) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). Courts analyze the preemption of local ordinances in the same fashion as statewide laws. *Id.* at 940, n.5.

In enacting CERCLA, Congress's central objective was "to develop, as its name suggests, a 'Comprehensive Environmental Response' to hazardous waste pollution." *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1353 (2020). "CERCLA 'seeks to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts are borne by those responsible for the contamination.'" *York v. Northrop Grumman Corp. Guidance & Elecs. Co., Inc.*, 2022 WL 19240760, at *4 (W.D. Mo. May 18, 2022) (quoting *Atl. Richfield*, 140 S. Ct. at 1345-46).

To accomplish this objective, CERCLA establishes a detailed framework for responding to contamination, beginning with a remedial investigation and feasibility study. *See* 42 U.S.C. §§ 9604, 9621, 9622. CERCLA provides that the response may be carried out: (a) by the President (acting through the EPA), 42 U.S.C. § 9604(a); or (b) by potentially responsible parties, like Ameren, through settlement and an ensuing consent decree, 42 U.S.C. §§ 9622(a), (d). These latter

11

settlements "are the heart of" CERCLA." *Atl. Richfield*, 140 S. Ct. at 1355 (explaining that settlements constitute 69% of all ongoing cleanup work). CERCLA "commands EPA to proceed by settlement '[w]henever practicable and in the public interest . . . in order to expedite effective remedial actions and minimize litigation.'" *Id.* (quoting 42 U.S.C. § 9622(a)); *see also Niagara Mohawk Power Corp. v. Chevron, U.S.A., Inc.*, 596 F.3d 112, 138 (2d Cir. 2010) (Congress sought "to encourage settlements" under CERCLA as an "impetus to efficient resolution of environmental hazards."). "Once finalized, the terms of a settlement become legally binding administrative orders, subject to civil penalties of up to $25,000 a day." *Atl. Richfield*, 140 S. Ct. at 1355.

To prevent interference with the achievement of these objectives, CERCLA provides that "[n]o Federal, State, or local permit shall be required for the portion of any removal or remedial action conducted entirely onsite, where such remedial action is selected and carried out in compliance with this section." 42 U.S.C. § 9621(e)(1). In addition to permitting, CERCLA likewise preempts the City's disruptive use of its zoning ordinances. *City & Cnty. of Denver*, 100 F.3d at 1512 ("This zoning ordinance also stands as an obstacle to the objectives of CERCLA, whose purpose is to effect the expeditious and permanent cleanup of hazardous waste sites, and to allow the EPA the flexibility needed to address site-specific problems."). While Congress saw fit to require EPA remedial actions to comply with applicable and relevant "State environmental or facility siting law," *see* 42 U.S.C. § 9621(d)(2)(ii), and even created a cause of action for States to enforce this provision, *see* 42 U.S.C. § 9621(e)(2), it made no such allowance for municipalities. So "to hold that Congress intended that non-uniform and potentially conflicting zoning laws could override CERCLA remedies would fly in the face of Congress's goal of effecting prompt cleanups of the literally thousands of hazardous waste sites across the country." *City & Cnty. of Denver*, 100 F.3d at 1513. Thus, Congress made clear municipal zoning ordinances are completely

12

preempted by CERCLA.

Here, Ameren is conducting its remedial actions, including the drilling of the extraction well, on site and in compliance with CERCLA and pursuant to the 2018 Settlement Agreement, which requires EPA approval. Contrary to the City's position, Ameren is *not* required to "appl[y] for or receive[] a permit for drilling the well pursuant to the Missouri Well construction rules 10 CSR 23, or the Water Well Driller's Act §256.640." Verified Petition ¶ 16. Nor is Ameren required to "submit[] a work plan as required by St. Charles Code §510.060-§510.220." *Id.* ¶ 23. These provisions are expressly preempted by 42 U.S.C. § 9621(e)(1).

CERCLA preempts the other code provisions because Ameren's EPA-approved activities cannot be constrained by the City's designations of "permitted" and non-permitted uses, which, according to the City, prohibit private wells and all uses of the property not enumerated in the City ordinance § 400.320(B) and (C). Verified Petition ¶¶ 19-22. Under CERCLA and the 2018 Settlement Agreement, Ameren must complete remedial actions as directed and approved by the EPA. Once the EPA approves the installation of an extraction well under its CERCLA authority, Ameren needs to install the well, regardless of the City's local "approval." Therefore, the City's ordinances are preempted. *City & Cnty. of Denver*, 100 F.3d at 1512-13.

Finally, the fact remains that the City's ordinance violations remain purely hypothetical. The City does not, and cannot, allege that Ameren has commenced any work that violates these ordinances. Instead, the Verified Petition recognizes that EPA approval remains pending. Perhaps because of the requirement of filing a *Verified* Petition, the City also fails to allege that any such work was imminent at the Substation, and even if it had made such allegations, the City lacks standing to seek to enjoin Ameren from allegedly violating an EPA requirement for approval of proposed work. The City cannot step into EPA's enforcement shoes and thereby usurp EPA's

13

exclusive jurisdiction over work performed at a Superfund site. Therefore, the City's Verified Petition should be dismissed.

### B. The Court Should Dissolve the State Court's *Ex Parte* TRO.

The TRO should be dissolved for a number of reasons. Before addressing the *Dataphase* factors, Ameren notes that the City's strategic decision to seek an *ex parte* TRO led the State Court into error. If Ameren's counsel had been asked for their availability for a hearing on September 14, Ameren would have been able to explain to the trial court in simple terms that Ameren would not begin drilling the extraction well begin without EPA approval.

In any event, there is a mismatch between the language of the TRO (presumptively prepared by the City for the trial court's signature) and the City's Verified Petition. After searching the Verified Petition, Ameren has failed to locate a sworn allegation that Ameren was about to commence work without EPA approval. There is also no sworn allegation "set forth in [the] Petition" to support the TRO finding that Ameren "has moved construction and drilling equipment onto its property despite the posted stop-work order issued by the City." Exhibit 1, State Court Action, TRO at 2. On the contrary, Ameren moved the equipment onto the property *before* the stop work order.

This is the danger of an *ex parte* TRO and a one-sided presentation of the facts. The TRO should not have been issued in the absence of supporting evidence—not simply representations from the City or its counsel that departed from the competent evidence.

No matter what, the TRO is unmaintainable under the *Dataphase* factors. First, as discussed above, the City cannot succeed on the merits because CERCLA preempts the City's claim. Indeed, following entry of the *ex parte* TRO, the City admits "the potential applicability of CERCLA 121(e)(1) to EPA approved remedial work." Exhibit 17, City's Sept. 18, 2023 Letter to

Ameren.  For this reason alone, the TRO should be dissolved.  *See, e.g.*, *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.,* 820 F. Supp. 2d 953 (N.D. Iowa 2011) (holding that because a claim was preempted, there is no likelihood of success on the merits).

Second, the Verified Petition fails to allege, and the City is unable to establish, a threat of irreparable harm.  In its motion, the City states that "irreparable harm to the St. Charles' wellfield will be suffered if the work is not halted until proper review and approval are conducted to ensure the safety of the wellfield." Exhibit 20, State Court Action, Pl.'s Mot. for TRO & Prelim. Inj. ¶ 4. On September 14, 2023, and today, no construction has started, and Ameren has committed to waiting for the EPA's approval prior to commencing work on the extraction well. *See* Exhibit 8, Ameren's Sept. 14, 2023 Letter to the City.  As a result, no irreparable harm has or will occur.  *See Local Union No. 884, United Rubber, Cork, Linoleum, & Plastics Workers of Am. v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995) (explaining where "[t]he possible harm identified is wholly speculative . . . , it cannot be called irreparable harm."); *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1011 (8th Cir. 2023) ("The plaintiffs must show the harm is not merely a possibility but is likely to occur absent preliminary injunctive relief." (internal citations and quotations omitted)).  In fact, the Verified Petition concedes that EPA approval eliminates the supposed threat.  Verified Petition ¶ 26 ("[A]llowing Ameren to again access the aquifer without approval from *any* oversight agency, be it the City, the State (MDNDR), *or the Federal Government (USEPA)*, is likely to cause irreparable harm . . . ." (emphasis added)).  The EPA's recent letters show its clear exercise of oversight.  *See* Exhibit 7, EPA's Sept. 18, 2023 Letter to Ameren; Exhibit 11, EPA's Sept. 7, 2023 Letter to the City.  Since "an absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction," the TRO should be dissolved.  *See Dataphase*, 640 F.2d at 114 n.9;

15

*see also Aerotek, Inc. v. Murphy*, 2017 WL 4617109 at *7 (E.D. Mo. Oct. 16, 2017) ("Under the clear law in this circuit, the injury in support of extraordinary preliminary injunctive relief must be both certain and great; it must be actual and not theoretical, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.").

Third, the balance of harms weighs against the TRO's continued existence. Continuation of the TRO will put Ameren in the unenviable position of having to decide whether to comply with explicit EPA approval under federal law or a state court's *ex parte* TRO. Under the current terms of the TRO, even after receiving EPA approval, Ameren must submit its work plans to the City and wait for the City's "approval" before commencing work. Exhibit 1, State Court Action, TRO. But, once the EPA approves Ameren's workplan, Ameren will not be able to commence its EPA approved work at the Substation without violating the terms of a binding court order. Such harm outweighs any potential harm caused by dissolution of the TRO.

Finally, the TRO, which on its face seeks to usurp EPA's authority is against public interest under CERCLA. Both the Ameren and the EPA are committed to ensuring the safety of the City's drinking water. The extraction well Ameren seeks to install is designed to protect against the spread of contaminants caused by the City's recent pumping of CW-4. The well was closed 18 years ago, more than six years before Ameren was named as a potentially responsible party. It has sat idle for almost two decades. The installation of the new extraction well will help ensure continued containment of the contaminants in light of the new groundwater flow patterns caused by the pumping. Furthermore, the City's pumping of groundwater into its sewers violates its own ordinance. *See* St. Charles City Code § 705.180 ("No persona shall discharge or cause to be discharged any . . . groundwater . . . to any sanitary sewer."). Unlike the City's knee-jerk response, the EPA's approval of the extraction well's installation will be based on a comprehensive review

16

of the workplan and the EPA's expert judgment that the extraction well would help prevent the migration of contaminants from the Substation.

For these reasons, the Court should dissolve the *ex parte* TRO.

### IV.     **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Plaintiff City of St. Charles' Verified Petition and dissolve the TRO entered by the Circuit Court of St. Charles County on September 14, 2023.


Dated:  September 22, 2023                    Respectfully submitted,

                **BRYAN CAVE LEIGHTON PAISNER LLP**

                By:     /s/ *Mark B. Leadlove*
                        Mark B. Leadlove              MO #33205
                        Christopher J. Schmidt      MO #53362
                        Mark Lenihan                    MO #75199
                        Brittainy Cavender            MO #72275
                        One Metropolitan Square
                        211 North Broadway, Suite 3600
                        St. Louis, Missouri 63102
                        Telephone: (314) 259-2000
                        Facsimile: (314) 259-2020
                        mbleadlove@bclplaw.com

                **BARNES & THORNBURG LLP**

                        Joseph F. Madonia (pro hac vice pending)
                        1 North Wacker Drive, Suite 4400
                        Chicago, Illinois 60606
                        Telephone: (312) 357-1313
                        joseph.madonia@btlaw.com

                        *ATTORNEYS FOR DEFENDANT UNION ELECTRIC COMPANY D/B/A AMEREN MISSOURI*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on September 22, 2023, a true and correct copy of the foregoing was served via email and U.S. Mail, postage prepaid, upon the following:

Portia C. Kayser
Harris Dowell Fisher & Young, L.C.
15400 South Outer Forty
Suite 202
Chesterfield, MO 63017
pkayser@harrisdowell.com

**Attorney for Plaintiff**

By: */s/ Mark B. Leadlove*
  **Attorney for Defendant**